George R. Wentz, Jr. (*Pro hac vice to be submitted*)
gwentz@davillierlawgroup.com
DAVILLIER LAW GROUP, LLC
935 Gravier Street, Suite. 1702
New Orleans, LA 70112
Telephone: 208-920-6140

Jefferson W. Gross (#8339)
jwgross@grsosrooney.com
Seamus W. Appel (#17783)
sappel@grossrooney.com
GROSS & ROONEY
136 East South Temple, Suite 1500
Salt Lake City, UT 84111
Telephone: 801-935-4611
Facsimile: 801-935-4612

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| DEVAN GRINER, MD,<br><br>Plaintiff,<br>v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as the President of the United States of America;<br><br>THE UNITED STATES OF AMERICA;<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;<br><br>XAVIER BECERRA in his official capacity as Secretary of the United States Department of Health and Human Services;<br><br>CENTERS FOR MEDICARE AND MEDICAID SERVICES; | Case No: 2:22-cv-00149-DAK<br>Judge Dale A. Kimball<br><br>**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL REQUESTED** |

| | |
|---|---|
| CHIQUITA BROOKS-LASURE in her official capacity as Administrator for the Centers for Medicare and Medicaid Services;<br><br>MEENA SESHAMANI in her official capacity as Deputy Administrator and Director of Center for Medicare; and<br><br>DANIEL TSAI in his official capacity as Deputy Administrator and Director of Center for Medicaid and CHIP Services;<br><br>Defendants. | |

Plaintiff Devan Griner, MD, ("Dr. Griner"), by and through counsel, complains against the above-named defendants as follows:

## I. INTRODUCTION

1. Plaintiff, Devan Griner, MD ("Dr. Griner"), brings this action to challenge the Centers for Medicare and Medicaid Services' ("CMS") Interim Final Rule with Comment Period (the "CMS Mandate") entitled "Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination." 86 Fed. Reg. 61,555 (Nov. 5, 2021).

2. The CMS Mandate requires that nearly every employee of any healthcare facility receiving Medicaid or Medicaid funding receive one of the three injections authorized for emergency use by the Food and Drug Administration as COVID-19 vaccines (the "Injections").

3. Dr. Griner is a highly skilled and well-known plastic surgeon licensed to practice in the State of Utah. Dr. Griner's passion is healing children who suffer from cleft palates and other congenital defects. Over the course of his career, Dr. Griner has performed corrective surgery on hundreds of such children in Utah and beyond, transforming their lives.

4. The CMS Mandate prevents Dr. Griner from continuing to heal children in this manner unless he takes one of the Injections, which Dr. Griner refuses to do.

5. However, the CMS Mandate must be struck down because:

i. The overwhelming evidence shows that the Injections do not prevent transmission, infection, or reinfection in those who receive them.

ii. The CDC Director has admitted that the Injections do not prevent infection or transmission of SARS-CoV-2, the virus that has been identified by various public health agencies as causing the disease known as COVID-19. "[W]hat [the vaccines] can't do anymore is prevent transmission."[1]

iii. The CDC has acknowledged that the "vaccinated" and "unvaccinated" are equally likely to spread the virus.[2]

iv. The Injections do not confer immunity but are claimed to reduce the severity of symptoms experienced by those infected by SARS-CoV-2. They are, therefore, treatments and not vaccines as that term has always been defined in the law.

---

[1] Madeline Holcomb, *Fully Vaccinated People Who Get a CoVID-19 Breakthrough Infection Transmit the Virus, CDC Chief Says,* CNN HEALTH (August 6, 2021) https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html (last visited March 1, 2022), *see also* The New England Journal of Medicine, *Resurgence of SARS-CoV-2 Infection in a Highly Vaccinated Health System Workforce,* N ENGL J MED 2021; 385:1330-1332 (September 30, 2021) https://www.nejm.org/doi/full/10.1056/NEJMc2112981(last visited March 1, 2022).

[2] Brown CM, Vostok J, Johnson H, et al. *Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021*. MMWR MORB MORTAL WKLY REP 2021;70:1059-1062. https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w (last visited March 1, 2022).

v. In fact, the CDC has actually changed its definitions of "vaccine" and "vaccination" so that the Injections would fit within the new definition. Until recently, the Centers for Disease Control defined a "Vaccine" as: "A product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease."[3]

vi. The CDC also previously defined "Vaccination" as: "The act of introducing a vaccine into the body to produce immunity to a specific disease."[4]

vii. Both prior definitions fit the common understanding of those terms. To be *vaccinated* meant that the recipient should have lasting, robust immunity to the disease targeted by the *vaccine*.

viii. But on September 1, 2021, the CDC quietly rewrote these definitions. It changed the definition of a "Vaccine" to: "A ~~product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease~~ *preparation that is used to stimulate the body's immune response against diseases*."[5] It changed the definition of "Vaccination" to: "The act of introducing a vaccine into the body to produce ~~immunity to~~ *protection from* a specific disease."[6]

ix. Thus, the CDC has eliminated the word "immunity" from its definitions of

---

[3] *Immunization: The Basics* (archived version), CENTERS FOR DISEASE CONTROL AND PREVENTION https://web.archive.org/web/20210826113846/https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm (last visited March 1, 2022).
[4] *Id*.
[5] *Immunization: The Basics*, CENTERS FOR DISEASE CONTROL AND PREVENTION https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm (last visited March 1, 2022).
[6] *Id*.

"Vaccine" and "Vaccination." Upon information and belief, the CDC did so because it recognizes that the Injections do not produce immunity to the disease known as COVID-19.

x. This is a critical factual and legal distinction. The Supreme Court has long held that the right to refuse medical treatment is a fundamental human right. Since the Injections do not stop the transmission of SARS-CoV-2 as a matter of fact, they are not "vaccines" as a matter of law. Instead, they are a therapeutic or medical treatment which Dr. Griner has the fundamental human right to refuse.

6. Additionally, the CMS Mandate is an *ultra vires* act which CMS does not have the legal authority to issue.

## II. PARTIES

7. Plaintiff, Dr. Griner, is a natural person living in the State of Utah.

8. Defendants are United States governmental officials and agencies responsible for adopting and implementing the CMS Mandate.

9. Defendant Joseph R. Biden, Jr., is the President of the United States of America. He is sued in his official capacity.

10. Defendant United States Department of Health and Human Services ("HHS") is an independent federal agency.

11. Defendant Xavier Becerra is the Secretary of HHS. He is sued in his official capacity.

12. Defendant CMS is part of HHS.

13. Defendant Chiquita Brooks-LaSure is the Administrator for the Centers for Medicare and Medicaid Services. She is sued in her official capacity.

14. Defendant Meena Seshamani is the Deputy Administrator and Director of the Center for Medicare. She is sued in her official capacity.

15. Defendant Daniel Tsai is the Deputy Administrator and Director of the Center for Medicaid and CHIP Services. He is sued in his official capacity.

16. This lawsuit seeks injunctive relief against Defendants in their official capacities, as well as a declaration that the CMS Mandate is illegal and unenforceable.

## III. JURISDICTION AND VENUE

17. This Court has jurisdiction pursuant to 5 U.S.C. §§ 702–703 and 28 U.S.C. §§ 1331, 1361, and 2201.

18. This Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. §§ 1361 and 2201–2202, and its inherent equitable powers.

19. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e). Defendants are United States agencies or officers sued in their official capacities.

## IV. GENERAL ALLEGATIONS

### A. Emergency Declarations Regarding COVID

20. On January 30, 2020, the World Health Organization ("WHO") declared a "public health emergency of international concern over the global outbreak" of a novel coronavirus. Among other recommendations, the WHO called for accelerated development of "vaccines, therapeutics and diagnostics."

21. On January 31, 2020, President Trump first issued a public health state of emergency in the United States under the Public Health Service Act due to the "novel coronavirus." This declaration of emergency has been renewed and remains in force.

22. Also on January 31, 2020, Secretary of Health and Human Services Alex M. Azar II, issued a Declaration of a Public Health Emergency effective as of January 27, 2020, stating, "Today President Trump took decisive action to minimize the risk of *novel coronavirus* in the United States."[7] (emphasis added) This declaration has been renewed thereafter and remains in force.

23. President Trump issued a subsequent declaration of emergency under the Stafford Act and National Emergencies Act on March 13, 2020, due to SARS-CoV-2. This declaration has been renewed and remains in force.

24. A third declaration of emergency was issued by President Trump on March 18, 2020, under the Defense Production Act due to SARS-CoV-2. This declaration has been renewed and remains in force.

---

[7] *Id*.

**B. Federal Mandates Based Upon the Proclaimed Emergency**

25. For the first six months of President Biden's Administration, none of his agencies sought to impose vaccine mandates on the American people. As recently as July 23, 2021, the White House announced that mandating vaccines is "not the role of the federal government."[8]

26. On September 9, President Biden gave a speech announcing his six-point plan to "turn the tide on COVID-19."[9] ("Biden Speech").

27. President Biden announced that the first plank of his plan is to "require more Americans to be vaccinated." Id. The purpose of this plan, as he said, is to "reduce the number of unvaccinated Americans." Id.

28. President Biden laid primary responsibility for the ongoing pandemic with unvaccinated Americans, saying that he is "frustrated with the nearly 80 million Americans who are still not vaccinated." Id. He stated that "[t]his is a pandemic of the unvaccinated," and that the "nearly 80 million Americans [who are] not vaccinated . . . can cause a lot of damage—and they are. . . . [O]ur patience is wearing thin. And your refusal has cost all of us. . . . For the vast majority of you who have gotten vaccinated, I understand your anger at those who haven't gotten vaccinated." Id.

29. President Biden announced several federal vaccine mandates: (1) a mandate from the Occupational Safety and Health Administration ("OSHA") for companies with more than 100

---

[8] Press Briefing by Press Secretary Jen Psaki (July 23, 2021), THE WHITE HOUSE, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/23/press-briefing-by-press-secretary-jen-psaki-july-23-2021/ (last visited March 1, 2022).

[9] President Joseph Biden, Remarks at the White House (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ (last visited March 1, 2022)

employees, (2) a mandate for federal employees, (3) a mandate for employees of federal contractors and subcontractors, and (4) the CMS vaccine mandate challenged here. Id.

**C. The President Claims Broad Police Powers Due to the Emergency**

30. President Biden also asserted that he as President enjoyed a broad federal police power that he could and would use to override state and local governments adopting policies that differed from those promulgated by him. Id. He stated: “Let me be blunt. My plan also takes on elected officials and states that are undermining . . . these lifesaving actions.” Id. Speaking of “governor[s]” who oppose the new federal mandates, he promised that “if these governors won’t help us beat the pandemic, I’ll use my power as President to get them out of the way.” Id.

**D. CMS Issues a Broad Mandate Covering Nearly All Health Care Workers**

31. On November 5, 2021, nearly two months after President Biden announced his federal vaccine mandates, CMS published the CMS Mandate challenged here. 86 Fed. Reg. 61,555. The CMS Mandate covers fifteen categories of Medicare- and Medicaid-certified providers and suppliers. By expanding its reach in this way, the CMA Mandate broadly covers a diverse set of healthcare providers. These include, among others, rural health clinics, hospitals, long-term-care facilities, and home health agencies. 86 Fed. Reg. at 61,569–70. Demonstrating the far reach of the mandate, CMS stated that “Medicare-participating hospitals . . . include nearly all hospitals in the U.S.” Id. at 61,577.

32. The CMS Mandate is sweeping in its scope. It applies to practically every full-time employee, part-time worker, trainee, student, volunteer, or contractor working at the covered facilities, which includes almost every health care facility in the United States. The CMS Mandate requires vaccination for all “facility staff”—a term that includes employees, trainees, students,

volunteers, or contractors— "who provide any care, treatment, or other services for the facility," "regardless of . . . patient contact." Id. at 61,570. This includes "administrative staff" and "housekeeping and food services," to name a few. Id. CMS also imposed its mandate on "any individual that . . . has the potential to have contact with anyone at the site of care." Id. at 61,571. This includes "staff that primarily provide services remotely via telework" but "occasionally encounter fellow staff . . . who will themselves enter a health care facility." Id. at 61, 570. The CMS Mandate is so broad that it also covers a contracted "crew working on a construction project whose members use shared facilities (restrooms, cafeteria, break rooms) during their breaks[.]" Id. at 61,571.

33. Consistent with this broad scope, CMS allowed exemptions only to the extent necessary to "comply with applicable Federal anti-discrimination laws and civil rights protections" such as medical exemptions required by the Americans with Disabilities Act ("ADA") and religious exemptions required by Title VII of the Civil Rights Act of 1964. Id. at 61,568.

34. CMS acknowledged the CMS Mandate's sweeping scope, noting its "near-universal applicability" to health-care staff, and observing that under the rule "virtually all health care staff in the U.S. will be vaccinated for COVD–19 within a matter of months." 86 Fed. Reg. at 61,573. CMS estimated that approximately 10.3 million employees will fall under the mandate. Id. at 61,603.

35. CMS justified the CMS Mandate in part because it determined that the "most important inducement [for vaccination] will be the fear of job loss." Id. at 61,607.

36. CMS "expect[s]" its CMS Mandate "to remain relevant for some time beyond the end" of the formal public health emergency and anticipates retaining the CMS Mandate "as a permanent requirement for facilities." Id. at 61,574.

37. CMS "considered requiring daily or weekly testing of unvaccinated individuals" instead of mandating that all employees receive the Injection. 86 Fed. Reg. at 61,614. But it chose the CMS Mandate for one reason: because it believes that "vaccination is a more effective infection control measure." Id. Thus, the CMS Mandate rests squarely on the basis that the Injection prevents transmission, stating:

> It is essential to reduce the transmission and spread of COVID-19 and vaccination is central to any multipronged approach for reducing health system burden, safeguarding health care workers and the people they serve, and ending the COVID-19 pandemic. Id. at 61,560.

38. At the same time, however, CMS recognized that it was unable to conduct a cost-benefit analysis of the mandate, stating:

> As explained in various places within this RIA and the preamble as a whole, there are major uncertainties as to the effects of current variants of SARS–CoV–2 on future infection rates, medical costs, and prevention of major illness or mortality. For example, the duration of vaccine effectiveness in preventing COVID–19, reducing disease severity, reducing the risk of death, and ***the effectiveness of the vaccine to prevent disease transmission by those vaccinated are not currently known.*** Id. at 61,615. (emphasis added)

39. CMS "considered whether it would be appropriate to limit COVID-19 vaccination requirements to staff who have not previously been infected by SARS-CoV-2." 86 Fed. Reg. at 61,614. Yet it decided against that option because it did not think that "infection-induced immunity, also called 'natural immunity'" is "equivalent to receiving the COVID-19 vaccine." Id. at 61,559. However, later in the CMS Mandate, CMS directly contradicts itself by equating natural immunity directly to vaccine induced immunity, stating:

> Moreover, among the general population more than 600,000 persons a day are currently being vaccinated with the first or second shot and ***about 100,000 a day have recovered from infection and are only in very rare cases still infectious.*** These changes reduce the risk to both health care staff and patients substantially, likely by about 20 million persons a month who are no longer sources of future infections. Id. at 61,604. (emphasis added)

40. The CMS Mandate became immediately effective on November 5, 2021—the day it was published. Id. at 61,555. 96. Covered providers must implement the CMS vaccine mandate in two 30-day phases. Id. at 61,571. Phase 1 requires that staff receive the first dose of the vaccine or request a medical or religious exemption by December 5, 2021. Id. And Phase 2 mandates that non-exempt staff be fully vaccinated by January 4, 2022. Id.

**E. Dr. Griner is Subject to the Mandate Despite Having Natural Immunity**

41. Dr. Griner is subject to the CMS Mandate because the hospitals in which he has the right to practice receive CMS funding. Thus, Dr. Griner must choose not just between his "job and the jab," as the Fifth Circuit has phrased it, he must also choose between pursuing his passion for healing children with congenital defects and taking the Injection. This despite the fact that the only justification for forcing Dr. Griner to take the injection is the assertion that doing so will prevent Dr. Griner from transmitting SARS-CoV-2 to his patients and other health care workers with whom he comes into contact, something the CDC readily admits the Injection simply does not do.

42. Moreover, Dr. Griner contracted COVID-19 on November 24, 2021 and recovered by December 1, 2021. He therefore has natural immunity to the Virus.

43. Those like Dr. Griner who recover from infection from SARS-CoV-2 (over 99% of those who are infected) enjoy robust and durable natural immunity. Natural immunity is superior to any immunity that may result from the Injections, which do not prevent re-infection or

transmission of the Virus, and do not prevent infection, re-infection, or transmission of the current strain.

**F. The Injections are Treatments, Not Vaccines**

44. As the CDC has tacitly conceded by changing its own definitions of "Vaccine" and "Vaccination," the Injections are not vaccines in the traditional sense. In fact, the FDA classifies them as "CBER-Regulated Biologics" otherwise known as "therapeutics" which falls under the "Coronavirus Treatment Acceleration Program."[10]

45. The Injections are misnamed as "vaccines" since they do not prevent infection, re-infection, or transmission of the disease—the key elements of a vaccine. On the other hand, the CDC has publicly stated that the Injections are effective in reducing the severity of the disease but not infection, re-infection, or transmission. Indeed, as noted above, the CDC has stricken the very word "immunity" from its definitions of "Vaccine" and "Vaccination." The injection is therefore a treatment, not a vaccine. However, this newly created CDC definition conflicts with the statutory criteria for a vaccine, which focuses solely upon immunity. In 1986, Congress passed 42 U.S.C. § 300aa-1, which established "a National Vaccine Program to achieve *optimal prevention of human infectious diseases through immunization* . . ." (emphasis added).

46. It is widely known and reported that the Injections do not create immunity that would prevent the transmission of the disease to others, as the following makes clear:

a. NIAID Director Dr. Anthony Fauci to NPR: "We know now as a fact that

[10] FDA, *Coronavirus (COVID-19) | CBER-Regulated Biologics*, https://www.fda.gov/vaccines-blood-biologics/industry-biologics/coronavirus-covid-19-cber-regulated-biologics (last visited March 1, 2022); *See also,* FDA, *Coronavirus Treatment Acceleration Program (CTAP)*, https://www.fda.gov/drugs/coronavirus-covid-19-drugs/coronavirus-treatment-acceleration-program-ctap (last visited March 1, 2022).

[vaccinated people with Covid-19] are capable of transmitting the infection to someone else."[11]

b. WHO Chief Scientist Dr. Soumya Swaminathan: "At the moment I don't believe we have the evidence of any of the vaccines to be confident that it's going to prevent people from actually getting the infection and therefore being able to pass it on."[12]

c. Chief Medical Officer of Moderna Dr. Tal Zaks: "There's no hard evidence that it stops [Covid-19 vaccinated people] from carrying the virus transiently and potentially infecting others who haven't been vaccinated."[13]

d. Professor Sir Andrew Pollard who led the Oxford vaccine team: "We don't have anything that will stop transmission, so I think we are in a situation where herd immunity is not a possibility and I suspect the virus will throw up a new variant that is *even better* at infecting vaccinated individuals."[14]

e. Dr. Jay Bhattacharya, MD, PhD, Professor of Health Policy, Stanford University: "Based on my analysis of the existing medical and scientific

---

[11] Stieg, C (July 28, 2021). *Dr. Fauci on CDC mask guidelines: 'We are dealing with a different virus now',* CNBC, https://www.cnbc.com/2021/07/28/dr-fauci-on-why-cdc-changed-guidelines-delta-is-a-different-virus.html (last visited March 1, 2022)

[12] Colson, T (December 29, 2020). *Top WHO scientist says vaccinated travelers should still quarantine, citing lack of evidence that COVID-19 vaccines prevent transmission.* BUSINESS INSIDER, https://www.businessinsider.com/who-says-no-evidence-coronavirus-vaccine-prevent-transmissions-2020-12?op=1 (last visited March 1, 2022).

[13] Manskar, N (November 24, 2020). *Moderna boss says COVID-19 vaccine not proven to stop spread of virus.* NEW YORK POST, https://nypost.com/2020/11/24/moderna-boss-says-covid-shot-not-proven-to-stop-virus-spread/ (last visited March 1, 2022).

[14] Knapton, S (October 8, 2021). *Delta variant has wrecked hopes of herd immunity, warn scientists.* THE TELEGRAPH. https://www.msn.com/en-gb/health/medical/delta-variant-has-wrecked-hopes-of-herd-immunity-warn-scientists/ar-AAN9O4p (last visited March 1, 2022).

literature, any exemption policy that does not recognize natural immunity is irrational, arbitrary, and counterproductive to community health."[15]

f. A study of a SARS-CoV-2 outbreak in July 2021 published in Eurosurveillance observed that 100% of severe, critical, and fatal cases of Covid-19 occurred in injected individuals. The authors stated that the study "challenges the assumption that high universal vaccination rates will lead to herd immunity and prevent COVID-19 outbreaks."[16]

g. Dr. Martin Kulldorff, Professor of Medicine at Harvard Medical School: "The bottom line is that these vaccines do not prevent transmission."[17]

h. Dr. Sunetra Gupta, Infectious Disease Epidemiologist and Professor of Theoretical Epidemiology at the University of Oxford:

> [I]t is really not logical to use [these] vaccines to protect other people … I don't think they should be forced to on the understanding simply because this vaccine does not prevent transmission. So if you just think of the logic of it, what is the point of requiring a vaccine to protect others if that vaccine does not durably prevent onward transmission of a virus?[18]

---

[15] Bhattacharya, J, et al. (June 4, 2021). *The beauty of vaccines and natural immunity*, SMERCONISH NEWSLETTER, https://www.smerconish.com/exclusive-content/the-beauty-of-vaccines-and-natural-immunity (last visited March 1, 2022).

[16] Pnina, S, et al. (September 23, 2021). *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021*. EURO SURVEILL. 2021;26(39):pii=2100822. https://doi.org/10.2807/1560-7917.ES.2021.26.39.2100822 (last visited March 1, 2022).

[17] Adams, P, et al. (October 20, 2021). *Who Are These COVID-19 Vaccine Skeptics and What Do They Believe?* EPOCH TIMES. https://www.theepochtimes.com/who-are-these-covid-19-vaccine-skeptics-and-what-do-they-believe_4043094.html (last visited March 1, 2022).

[18] Allen, R (September 9, 2021). *Oxford Scientist "It's Illogical & Unethical To Force Jab On NHS Staff"*. The Richie Allen Radio Show. https://richieallen.co.uk/oxford-scientist-its-illogical-unethical-to-force-jab-on-nhs-staff/ (last visited March 1, 2022).

47. One of the reasons that the Injections do not prevent transmission is that coronaviruses like SARS-CoV-2 rapidly mutate. The Injections were designed to address the original strain of the Virus. However, during the course of 2021, the Delta strain became dominant.[19] The CDC Director has stated that the vaccines did not stop the transmission of the Delta strain. Studies showed the Delta strain passes easily amongst vaccinated persons.[20] The CDC website states: "… preliminary evidence suggests that fully vaccinated people who do become infected with the Delta variant can spread the virus to others."[21]

48. The current Omicron variant has now overtaken Delta to become the dominant strain.[22] The CDC recognizes that the Injections do not prevent the transmission of the Omicron variant, just as they did not prevent the transmission of the Delta variant.

49. The CDC website addressing the Omicron variant states:

> The Omicron variant spreads more easily than the original virus that causes COVID-19 and the Delta variant. ***CDC expects that anyone with Omicron infection can spread the virus to others, even if they are vaccinated or don't have symptoms.*** Id. (emphasis added)

---

[19] *Variant Proportions,* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last visited March 1, 2022).

[20] Chau, Nguyen Van Vinh and Ngoc, Nghiem My and Nguyet, Lam Anh and Quang, Vo Minh, OUCRU COVID-19 Research, et al, *Transmission of SARS-CoV-2 Delta Variant Among Vaccinated Healthcare Workers, Vietnam.* ECLINICALMEDICINE, Volume 41, November 2021, 11043 https://doi.org/10.1016/j.eclinm.2021.101143 (last visited March 1, 2022).

[21] *Interim Public Health Recommendations for Fully Vaccinated People* (Archived Version), CENTERS FOR DISEASE CONTROL AND PREVENTION, https://web.archive.org/web/20211018044550/https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (last visited March 1, 2022).

[22] *Omicron Variant: What You Need to Know*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last visited March 1, 2022).

50. While recognizing the Injections to not prevent transmission of the Virus, the CDC states that the Injections do prevent the severity of symptoms from the disease, stating:

> Scientists are still learning how effective COVID-19 vaccines are at preventing infection from Omicron. Current vaccines are expected to protect against severe illness, hospitalizations, and deaths due to infection with the Omicron variant. However, breakthrough infections in people who are vaccinated are likely to occur. People who are up to date with their COVID-19 vaccines and get COVID-19 are less likely to develop serious illness than those who are unvaccinated and get COVID-19. Id.

51. Thus, the CDC recognizes that the Injections do not prevent transmission but instead may reduce the severity of the symptoms. This is the classic definition of a treatment, not a vaccine.

52. This was summed up quite nicely by Moderna Chief Medical Officer Tal Zaks, who "warned that the trial results show that the vaccine can prevent someone from getting sick or 'severely sick,' from COVID-19, however, the results don't show that the vaccine prevents transmission of the virus."[23]

53. Even the FDA has classified Injections as "CBER-Regulated Biologics" otherwise known as "therapeutics" which fall under the "Coronavirus Treatment Acceleration Program."[24]

---

[23] Al-Arshani, S (November 2020). *Moderna's chief medical officer says that vaccine trial results only show that they prevent people from getting sick – not necessarily that recipients won't still be able to transmit the virus.* BUSINESS INSIDER. https://www.businessinsider.com/moderna-chief-medical-officer-vaccines-interview-2020-11 (last visited March 1, 2022).

[24] *Coronavirus (COVID-19) | CBER-Regulated Biologics,* FOOD AND DRUG ADMINISTRATION (2021). https://www.fda.gov/vaccines-blood-biologics/industry-biologics/coronavirus-covid-19-cber-regulated-biologics (last visited March 1, 2022); *Coronavirus Treatment Acceleration Program (CTAP)*, FOOD AND DRUG ADMINISTRATION (2021), https://www.fda.gov/drugs/coronavirus-covid-19-drugs/coronavirus-treatment-acceleration-program-ctap (last visited March 1, 2022).

54. The FDA's "therapeutics" classification of the Injections is consistent with representations made by Pfizer injection partner BioNTech to the Securities and Exchange Commission ("SEC") in its 2020 Annual Report, where it stated with regard to the mRNA technology forming the basis of its Injection:

> Although we expect to submit BLAs [biologics license applications] for our mRNA-based product candidates in the United States, and in the European Union, mRNA therapies have been classified as gene therapy medicinal products, and other jurisdictions may consider our mRNA-based product candidates to be new drugs, not biologics or gene therapy medicinal products, and require different marketing applications.[25]

55. Similarly, in its June 30, 2020 Quarterly Report to the SEC, Moderna stated with regard to the mRNA technology underpinning its injection: "Currently, mRNA is considered a gene therapy product by the FDA."[26]

**G. The Effects of the Injections Wane Rapidly**

56. Additionally, the effectiveness of the Injections has been determined to wane rapidly. Israel, the most vaccinated and studied nation, now expires the vaccine's effectiveness at six months.[27] The requirement for booster shots due to this waning of effectiveness has been recognized by the CDC, which initially recommended no booster shots, then annually, then at 8 months and then 6 months.

---

[25] *BioNTech SE Form 20-F,* UNITED STATES SECURITIES AND EXCHANGE COMMISSION (2020), https://www.sec.gov/Archives/edgar/data/1776985/000156459021016723/bntx-20f_20201231.htm at page 26 (last visited March 1, 2022).

[26] *Moderna SE Form 10-q,* UNITED STATES SECURITIES AND EXCHANGE COMMISSION (2020), https://www.sec.gov/Archives/edgar/data/1682852/000168285220000017/mrna-20200630.htm at page 70 (last visited March 1, 2022).

[27] Marianne Guenot, *Israel's Vaccine Pass Will Expire 6 Months after 2nd Dose, Meaning People Will Need Booster Shots to Keep Going to Restaurants and Bars,* BUSINESS INSIDER, https://www.businessinsider.com/israel-vaccine-pass-to-expire-after-6-months-booster-shots-2021-9 (last visited March 1, 2022).

57. Dr. Anthony Fauci on November 12, 2021, referring to the experience of health officials regarding the Injections, stated:

> They are seeing a waning of immunity not only against infection but against hospitalization and to some extent death, which is starting to now involve all age groups. It isn't just the elderly. It's waning to the point that you're seeing more and more people getting breakthrough infections, and more and more of those people who are getting breakthrough infections are winding up in the hospital.[28]

58. Those countries with the highest rates of the Injections also experience the highest rates of infection. Those countries with the highest rates of the Injections also have the highest rates of hospitalization and severe illnesses with regard to the prior Delta strain as well as the Omicron strain, which is the current strain of the Virus.

**H. The Injections are Gene Therapy Devices, Not Vaccines**

59. The Injections are most appropriately classified under the law as gene therapy medical devices.

60. As described by Moderna on its website:

> **Enabling Drug Discovery & Development**
> We built Moderna on the guiding premise that if using mRNA as a medicine works for one disease, it should work for many diseases. And, if this is possible – given the right approach and infrastructure – it could meaningfully improve how medicines are discovered, developed and manufactured.
>
> **Our Operating System**
> Recognizing the broad potential of mRNA science, ***we set out to create an mRNA technology platform that functions very much like an operating system on a computer.*** It is designed so that it can plug and play interchangeably with different programs. In our case, the "program" or "app" is our mRNA drug - the unique mRNA sequence that codes for a protein.
>
> ***We have a dedicated team of several hundred scientists and engineers solely focused on advancing Moderna's platform technology.*** They are organized around

[28] Coleman, K (November 12, 2021). *Dr. Fauci Just Issued This Urgent Warning to Vaccinated People,* YAHOO NEWS, https://www.yahoo.com/lifestyle/dr-fauci-just-issued-urgent-201846228.html (last visited March 1, 2022).

key disciplines and work in an integrated fashion to advance knowledge surrounding mRNA science and solve for challenges that are unique to mRNA drug development. Some of these disciplines include mRNA biology, chemistry, formulation & delivery, bioinformatics and protein engineering. (emphasis added)




## Our mRNA Medicines – The 'Software of Life'

When we have a concept for a new mRNA medicine and begin research, fundamental components are already in place.

Generally, the only thing that changes from one potential mRNA medicine to another is the coding region – the actual genetic code that instructs ribosomes to make protein. Utilizing these instruction sets gives our investigational mRNA medicines a software-like quality. We also have the ability to combine different mRNA sequences encoding for different proteins in a single mRNA investigational medicine.

We are leveraging the flexibility afforded by our platform and the fundamental role mRNA plays in protein synthesis to pursue mRNA medicines for a broad spectrum of diseases. [29]

61. Thus, Moderna recognizes that its mRNA platform is not a vaccine, but rather gene therapy in the form of biological "software" designed to genetically "hack" the machinery of

[29] *mRNA Platform: Enabling Drug Discovery and Development*, MODERNA, https://www.modernatx.com/mrna-technology/mrna-platform-enabling-drug-discovery-development (last visited March 1, 2022).

human cells to create a specific protein. The Pfizer BioNTech Injection utilizes the same mRNA gene therapy to genetically modify human cells as Moderna.

62. In the case of the Injections, the specific protein that human cells are "hacked" to create is the spiked protein of the disease itself. The Injections genetically modify human cells to create the same toxic protein that the disease itself creates – the spiked protein. These spiked proteins adhere to the endothelial cells of humans, the very cells that line the entire cardiovascular system. The spike proteins adhere to the interior of the cardiovascular system like thorns on a rose bush, causing a variety of detrimental effects, the short- and long-term impact of which are currently unknown and unknowable.

63. At this time, there is no known method to reverse the detrimental effects of the Injections. Once a human is injected, that human cannot be uninjected. The impact is irreversible, and the harm is irreparable; even though the alleged emergency that supports the CMS Mandate is by definition temporary.

64. According to a June 01, 2021 bio-distribution study from the Japanese Regulator Agency, the spike protein of the "…coronavirus gets into the blood where it circulates for several days post-vaccination…" and that it concentrates "…in spleen, liver, adrenals, and ovaries in high concentrations…"[30]

65. The long-established CDC database VAERS (Vaccine Adverse Events Reporting System) demonstrates significantly higher reports of deaths and adverse events with the Injections than with prior vaccines.[31] There are reports of neurological adverse events, including Guillain-

---

[30] Alexander, Paul (June 1, 2021), *The COVID-19 spike protein may be a potentially unsafe toxic endothelial pathogen*, TRIALSITENEWS, https://trialsitenews.com/the-covid-19-spike-protein-may-be-a-potentially-unsafe-toxic-endothelial-pathogen/ (last visited March 1, 2022).

[31] Rose, J. *Critical Appraisal of VAERS Pharmacovigilance: Is the U.S. Vaccine Adverse Events Reporting System (VAERS) a Functioning Pharmacovigilance System?* SCIENCE, PUBLIC HEALTH POLICY, AND THE LAW, Vol. 3:100-129 (Oct 2021), https://cf5e727d-d02d-4d71-89ff-9fe2d3ad957f.filesusr.com/ugd/adf864_0490c898f7514df4b6fbc5935da07322.pdf (last visited

Barre, Bell's Palsy, Transverse Myelitis, Paralysis, Seizure, Stroke, Dysstasia, Aphasia, and Tinnitus, as well as cardiovascular events such as clot and cardiac arrest.

66. There is extensive evidence that the spike protein produced in the body as a result of the Injections causes micro-clotting throughout the body, permanently damaging the recipient's cardiovascular system.

## V. FACTUAL ALLEGATIONS SPECIFIC TO DR. GRINER

67. Dr. Griner is a Utah native. He was born in Salt Lake City, Utah.

68. As a Junior at Skyline High School, Dr. Griner had the opportunity to join an Operation Smile mission to Vietnam. This was a life altering experience for him and where he decided to become a Plastic Surgeon.

69. He attended Brigham Young University in Provo, Utah, graduating in 2002 with a Bachelor of Science degree, where he studied biology and published his first research on cleft palates.

70. He attended medical school at the University of Utah, graduating with a Doctor of Medicine degree in 2006.

71. During his undergraduate and medical school years he worked as a surgical technician, working closely with some of the top plastic surgeons in Utah. Tutored by them, he learned the intricacies of suturing and gave him quite an advantage later on as he was able to fine-tune his skill, while his colleagues were learning the basics.

72. While attending medical school, Dr. Griner founded an Operation Smile outreach program that helped local children with craniofacial disorders receive continued care plans that had been abandoned due to financial or other social issues.

March 1, 2022); Vaccine Adverse Events Reporting System (VAERS), CENTERS FOR DISEASE CONTROL AND PREVENTION, https://wonder.cdc.gov/vaers.html (last visited March 1, 2022).

73. After medical school, he completed a 5-year general surgery residency at the University of North Carolina in Wilmington from July 2006 to June 2011.

74. As a board-certified General Surgeon, he secured a competitive 3-year Plastic Surgery residency at the University of Tennessee in Chattanooga, arguably one of the busiest plastic surgery programs in the country for both reconstructive and aesthetic procedures. He completed his Plastic Surgery residency in June of 2014.

75. Chasing his passion for pediatric reconstructive surgery, he pursued further training, and was chosen for the top Craniofacial fellowship with Dr. Fearon at Medical City Children's in Dallas, Texas.

76. Returning to Utah, Dr Griner brought with him new techniques and unparalleled experience from all over the country in both pediatric and aesthetic surgery. He founded the Cleft and Craniofacial Institute of Utah and put together the most comprehensive Cleft and craniofacial team in Utah and is providing unparalleled comprehensive cleft care to hundreds of children throughout the state. He and his wife also started the Utah Smiles Foundation – a non-profit organization founded to help local children along their reconstructive journey.

77. Dr. Griner is double board-certified in General Surgery and Plastic Surgery, and fellowship-trained in Pediatric Plastic and Craniofacial Surgery. A widely published author, he speaks at conferences both nationally and internationally instructing other surgeons.

78. Dr. Griner and his wife, a nurse, share the passion of helping children with deformities. Together they have been on over twenty medical missions to over 15 countries. Jointly they raise funds and donate their time and operative talent to help unfortunate children all over the world.

79. The CMS Mandate threatens to bring this lifelong pursuit of excellence in the service of others to an end, irreparably harming not only Dr. Griner, but all those he heals through his practice and the Utah Smiles Foundation.

80. All conditions precedent to this action have been performed, excused, and/or waived.

**FIRST CAUSE OF ACTION**

**VIOLATION OF FIFTH AND FOURTEENTH AMENDMENT**

**SUBSTANTIVE DUE PROCESS**

**(Plaintiff Against All Defendants)**

81. Plaintiff reallege all allegations set forth in paragraphs 1 through 77 of this Complaint as if fully set forth herein.

82. The CMS Mandate violates the liberty protected by the Fifth and Fourteenth Amendments to the Constitution, which includes rights of personal autonomy, self-determination, bodily integrity and the right to reject medical treatment.

83. The Injections are not vaccines, as that term has traditionally been understood, but are, as a factual matter, medical treatments. Indeed, the CDC even recently changed its own definitions of "Vaccine" and "Vaccination" to eliminate the word, "immunity."

84. Immunity is the *sine qua non* of all vaccines.

85. The ability to decide whether to accept or refuse medical treatment is a fundamental right.

86. Accordingly, the CMS Mandate violates Plaintiffs' constitutional right to decisional privacy with regard to medical treatment.

87. Because the Injections are treatments, and not vaccines, strict scrutiny applies. The US Supreme Court has recognized a "general liberty interest in refusing medical treatment." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278, 110 S. Ct. 2841, 2851, 111 L.Ed.2d 224, 242 (1990). It has also recognized that the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty. *Washington v. Harper*, 494 U.S. 210, 229, 110 S. Ct. 1028, 1041, 108 L.Ed.2d 178, 203 (1990), see also *id*. at

223 (further acknowledging in dicta that, outside of the prison context, the right to refuse treatment would be a "fundamental right" subject to strict scrutiny).[32]

88. As mandated medical treatments are a substantial burden, Defendants must prove that the CMS Mandate is narrowly tailored to meet a compelling interest.

89. No such compelling interest exists because, as alleged above, the Injections are not effective against the now dominant Omicron variant of SARS-CoV-2 in that they do not prevent the recipient from becoming infected, getting reinfected, or transmitting SARS-CoV-2 to others. Indeed, evidence shows that vaccinated individuals have more SARS-CoV-2 in their nasal passages than unvaccinated people do.

90. The Injections may have been somewhat effective against the original SARS-CoV-2 strain, but that strain has come and gone, and the Injections—designed to fight yesterday's threat—are simply ineffective against the current variant.

91. Since the Injections are ineffective against the Delta and Omicron viral variants, and the original variant has been supplanted, there can be no compelling interest to mandate their use at this time.

---

[32] Although *Cruzan* was decided under the due process clause of the Fourteenth Amendment, the Supreme Court has long held that the same substantive due process analysis applied to the states under the due process clause of the Fourteenth Amendment also applies to the federal government under the due process clause of the Fifth Amendment. *See, e.g., Bolling v. Sharpe,* 347 U.S. 497, 500 (1954) ("In view of our decision that the Constitution prohibits the states from maintaining racially segregated public schools, it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government.") *See also, Adarand Constructors v. Pena*, 515 U.S. 200 (1995) (same); *Frontiero v. Richardson*, 411 U.S. 677 (1973) (holding federal law discriminating on basis of sex unconstitutional under the Fifth Amendment due process clause based on Fourteenth Amendment analysis); *Califano v. Goldfarb*, 430 U.S. 199 (1977) (striking down federal racial classification on basis of Fifth Amendment due process clause stating that strict scrutiny is the proper standard for analysis of all racial classifications, whether imposed by a federal, state, or local actor. *Id*. at 231, superseded by statute); *Jimenez v. Weinberger*, 417 U.S. 628 (1974) (striking down provision of the Social Security Act based upon illegitimacy applying substantive due process analysis through the due process of clause of the Fifth Amendment).

92. But even if there were a compelling interest in mandating the Injections, the CMS Mandate is not narrowly tailored to achieve such an interest.

93. The blanket mandate ignores individual factors increasing or decreasing the risks that the plaintiff—indeed, all healthcare workers—pose to themselves or to others.

94. Defendants entirely disregard whether employees have already obtained natural immunity despite the fact that natural immunity does actually provide immunity whereas the Injections do not.

95. Treating all employees the same, regardless of their individual medical status, risk factors, and natural immunity status is not narrowly tailored.

96. Moreover, the CMS Mandate fails entirely to consider other existing treatment options beyond the Injections as part of a more narrowly tailored approach.

97. Given these facts, as more fully set forth above, the CMS Mandate has no real or substantial relation to public health or is beyond all question, a plain, palpable invasion of rights secured by the fundamental law. Alternatively, the CMS Mandate has no real or substantial relation to public health or is beyond all question, a plain, palpable invasion of rights secured by the fundamental law as to Plaintiff, who already has natural immunity.

98. The CMS Mandate also violates the unconstitutional-conditions doctrine, under which the government may not condition employment "on a basis that infringes [an employee's] constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593,597 (1972); see also *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) ("[T]he unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them.").

99. Unconstitutional conditions case law often references the existence of varying degrees of coercion. According to that body of law, Defendants cannot impair Plaintiff's right to

refuse medical care through forms of coercion and through this explicit mandate. See, e.g., *Koontz*, 570 U.S. 595 (2013).

100. ("[U]nconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them"); *Memorial Hosp. v. Maricopa Cty.*, 415 U.S. 250 (1974) ("[An] overarching principle, known as the unconstitutional conditions doctrine ... vindicates the Constitution's enumerated rights by preventing the government from coercing the people into giving them up.")

101. The decision whether to take a medical treatment or not is a fundamental human right which Plaintiff enjoys. Plaintiff cannot be forced to choose between his right to refuse medical treatment by the government coercively withholding his right to pursue his career as a surgeon, and his passion to heal children with congenital defects such as cleft palates.

102. Accordingly, Plaintiff is entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing the CMS Mandate.

103. Pursuant to 28 U.S. Code §§ 2201-02 and other applicable law, Plaintiffs are entitled to a declaration that the CMS Mandate is unlawful and any further relief which may be appropriate.

## SECOND CAUSE OF ACTION

### Violation of Fifth and Fourteenth Amendment

### Equal Protection

### (Plaintiff Against All Defendants)

104. Plaintiff realleges and incorporates by reference his allegations in paragraphs 1 through 77 of the Complaint as if fully alleged herein.

105. The Equal Protection Clause prohibits classifications that affect some groups of citizens differently than others. (*Engquist v. Or. Dept. of Agric.* (2008) 553 U.S. 591, 601.) The

touchstone of this analysis is whether a state creates disparity between classes of individuals whose situations are arguably indistinguishable. (*Ross v. Moffitt* (1974) 417 U.S. 600, 609.)

106. The CMS Mandate creates two classes of healthcare workers; injected and uninjected. The members of one class, the uninjected, get terminated. The uninjected cannot advance their careers. They cannot provide for their families, pay their mortgages, or make a car payment. The other class, the vaccinated, get to keep their job in their chosen profession, advance their careers, provide for their families, pay their mortgages, and make their car payments.

107. Yet the situations of these employees are indistinguishable because injected healthcare workers can become infected with SARS-CoV-2, become re-infected with SARS-CoV-2, and can transmit SARS-CoV-2 to fellow healthcare workers, patients, and visitors. The Injections make no difference in these respects. Their only function is to make symptoms less severe.

108. Discriminating against the uninjected controverts the goals of the Equal Protection Clause – i.e., to abolish barriers presenting unreasonable obstacles to advancement on the basis of individual merit.

109. Pursuant to the Fifth and Fourteenth Amendments, Plaintiff is entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing the CMS Mandate.

**THIRD CAUSE OF ACTION**

**Ultra Vires Act by All Defendants**

110. Plaintiff realleges and incorporates by reference all allegations in paragraphs 1 through 77 as if fully set forth herein.

111. Defendants' actions in issuing the CMS Mandate violate the Constitution of the United States in that they invade and encroach upon sovereign powers that reside solely in the

States, and have never been relinquished by the States to the Federal Government. The CMS Mandate thus violates the dual sovereignty principle of the Constitution.

112. The police powers, those having to do with the health, safety and welfare of the people of the United States were specifically retained by the States when the Constitution was adopted by the States.

113. The CMS Mandate purports to rest upon a general police power asserted by the Federal Government. The Federal Government has no such general police power. Therefore, the CMS Mandate is an *ultra vires* act taken by the Federal Government because the powers the Federal Government claims to assert were never given to it, but instead were retained by the States.

114. Pursuant to the Constitution of the United States, Plaintiff is entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing the CMS Mandate.

**PRAYER**

Wherefore, Plaintiffs pray for judgment in their favor and against Defendants as follows:

**ON THE FIRST CAUSE OF ACTION**

1. Temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing the CMS Mandate; and

2. For a judicial declaration that the CMS Mandate is illegal and unconstitutional, and is therefore null and void *ab initio* and of no force and effect;

3. For reasonable attorneys' fees and costs; and

4. For any other relief the Court may deem equitable and just.

**ON THE SECOND CAUSE OF ACTION**

1. Temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing the CMS Mandate; and

2. For a judicial declaration that the CMS Mandate is illegal and unconstitutional, and is therefore null and void *ab initio* and of no force and effect; and

3. For reasonable attorneys' fees and costs; and

4. For any other relief the Court may deem equitable and just;

**ON THE THIRD CAUSE OF ACTION**

1. Temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing the CMS Mandate; and

2. For a judicial declaration that the CMS Mandate is illegal and unconstitutional, and is therefore null and void *ab initio* and of no force and effect; and

3. For reasonable attorneys' fees and costs; and

4. For any other relief the Court may deem equitable and just.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a right to a jury trial for all matters so triable.

DATED this 3rd day of March, 2022.

DAVILLIER LAW GROUP, LLC

*/s/ George R. Wentz, Jr.*
George R. Wentz, Jr.

GROSS & ROONEY

*/s/ Jefferson W. Gross*
Jefferson W. Gross

*Attorneys for Plaintiff*

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Footnote 1a: *Fully Vaccinated People Who Get a CoVID-19 Breakthrough Infection Transmit the Virus, CDC Chief Says* |
| B | *Footnote 1b: Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021* |
| C | *Footnote 3: Immunization: The Basics* (archived version), CENTERS FOR DISEASE CONTROL AND PREVENTION |
| D | *Footnote 11: Dr. Fauci on CDC mask guidelines: 'We are dealing with a different virus now'* |
| E | *Footnote 12: Top WHO scientist says vaccinated travelers should still quarantine, citing lack of evidence that COVID-19 vaccines prevent transmission* |
| F | *Footnote 13: Moderna boss says COVID-19 vaccine not proven to stop spread of virus* |
| G | *Footnote 14: Delta variant has wrecked hopes of herd immunity, warn scientists* |
| H | *Footnote 15: The beauty of vaccines and natural immunity*, SMERCONISH NEWSLETTER |
| I | *Footnote 16: Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021*. EURO SURVEILL. 2021;26(39 |
| J | *Footnote 17: Who Are These COVID-19 Vaccine Skeptics and What Do They Believe?* |
| K | *Footnote 18: Oxford Scientist: "It's Illogical and Unethical to Force Jab on NHS Staff:* |
| L | *Footnote 20: "An observational study of breakthrough SARS-CoV-2 Delta variant infections among vaccinated healthcare workers in Vietnam"* |
| M | *Footnote 22: "Interim Public Health Recommendations for Fully Vaccinated Peopled"* |
| N | *Footnote 23: "Moderna's chief medical officer says that vaccine trial results only show that they prevent people from getting sick – not necessarily that recipients won't will be able to transmit the virus"* |

| | |
|---|---|
| O | *Footnote 27: "Israel's vaccine pass will expire 6 months after the 2nd dose meaning people will need booster shots to keep going to restaurants and bars"* |
| P | *Footnote 28: "Dr. Fauci Just Issued This Urgent Warning to Vaccinated People"* |
| Q | *Footnote 29: "mRNA Platform: Enabling Drug Discovery & Development"* |
| R | *Footnote 30: The COVID-19 spike protein may be a potentially unsafe toxic endothelial pathogen"* |
| S | *Footnote 31: Critical Appraisal of VAERS Pharmacovigilance: Is the U.S. Vaccine Adverse Events Reporting System (VAERS) a Functioning Pharmacovigilance System?"* |