IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DEVAN GRINER, M.D.,<br><br>        Plaintiff,<br><br>vs.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America; THE UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA in his official capacity as Secretary of the United States Department of Health and Human Services; CENTERS FOR MEDICARE AND MEDICAID SERVICES; CHIQUITA BROOKS-LASURE in her official capacity as Administrator for the Centers for Medicare and Medicaid Services; MEENA SESHAMANI in her official capacity as Deputy Administrator and Director of Center for Medicare; and DANIEL TSAI in his official capacity as Deputy Administrator and Director of Center for Medicaid and CHIP Services;<br><br>        Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING AS MOOT PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION<br><br>Civil Case No. 2:22CV149 DAK-DBP<br><br>Judge Dale A. Kimball |

This matter is before the court on Plaintiff Devan Griner, M.D.'s Motion for Preliminary Injunction and on Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and for Failure to State a Claim. On July 6, 2022, due to the COVID-19 pandemic, the court held a hearing on the motion via Zoom videoconferencing.  At the hearing, George R. Wentz, Jr.,

represented Plaintiff Devan Griner, M.D., and Joel L. McElvain represented Defendants. The court took the motions under advisement. After carefully considering the memoranda[1] filed by the parties and the law and facts relevant to the pending motions, the court issues the following Memorandum Decision and Order. For the reasons explained below, the court grants Defendants' Motion to Dismiss and denies Plaintiff's Motion for Preliminary Injunction.

## I.   BACKGROUND

COVID-19 has "overtaken the 1918 influenza pandemic as the deadliest disease in American history." *Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination*, 86 Fed. Reg. 61,555, 61,556 (Nov. 5, 2021). By the time the rule at issue here was issued in November 2021, SARSCoV-2, the virus that causes COVID-19, had infected over 44 million people, hospitalized more than 3 million people, and claimed more than 720,000 lives in the United States. Those numbers have only grown since that time. The virus can easily pass from person to person at health care facilities. As a result, the pandemic has been devastating for healthcare facilities and patients alike. Fortunately, the vaccines now approved or authorized to protect against COVID-19 are safe and highly effective.

---

[1] The court has also considered all the post-hearing documents filed in this case. Specifically, Defendant filed a Notice of Supplemental Authority [ECF No. 26] on July 7, 2022. Dr. Griner then filed a Motion to Supplement the Record [ECF No. 28] on July 13, 2022, and a Second Motion to Supplement the Record [ECF No. 34] on July 28, 2022. After considering the briefing on those motions, the court granted the two motions to supplement the record [ECF No. 41] on August 17, 2022. Dr. Griner also filed a Notice of Supplemental Authority [ECF. No. 40] on August 16, 2022.

The Secretary of Health and Human Services reviewed this evidence and concluded that action was urgently needed to protect patients from infection with the virus while they receive care in facilities funded by Medicare and Medicaid. Congress has assigned the Secretary a statutory responsibility to ensure that the health and safety of patients are protected in these federally funded facilities. To do so, he issued a rule, the Center for Medicare and Medicaid Services' ("CMS") Interim Final Rule (hereinafter referred to as the "CMS Rule," "Vaccination Rule," or the "Rule"), requiring certain health care facilities, as a condition of their participation in these programs, to ensure that those members of their healthcare staff who interact with patients, or who have contact with other staff who do so, receive vaccination for COVID-19, absent an exemption.

The Secretary calculated that the implementation of the CMS Rule would save hundreds, and possibly thousands, of lives each month. After two District Courts enjoined enforcement of the Rule, the Government asked the United States Supreme Court to stay the injunctions. The Court reviewed the CMS Rule on an expedited basis, and on January 13, 2022, it stayed the lower courts' injunctions. The Court held that the Secretary had statutory authority to issue the Rule and that the record supported his finding that the CMS Rule was needed to prevent the transmission of the virus that causes COVID-19 within federally funded healthcare facilities. *Biden v. Missouri*, 142 S. Ct. 647 (2022) (*per curiam*).[2] The Court recognized

---

[2] On May 12, 2022, ten states challenged the January 13, 2022, decision, filing a petition for writ of certiorari. On October 3, 2022, the United States Supreme Court denied the petition. Greg Stohr, *Biden Vaccine Mandate for Health Workers Survives Supreme Court Appeal*, BLOOMBERG, U.S. EDITION, Oct. 3, 2022, https://www.bloomberg.com/news/articles/2022-10-03/biden-

that "perhaps the most basic" function that the Secretary of Health and Human Services

performs "is to ensure that the healthcare providers who care for Medicare and Medicaid

patients protect their patients' health and safety." *Id*. at 650.

In exercising this function, the Secretary found "that vaccination of healthcare workers

against COVID–19 was 'necessary for the health and safety of individuals to whom care and

services are furnished.'" *Id.* at 651 (quoting 86 Fed. Reg. 61,555, 61,561 (Nov. 5, 2021)). "That

determination was based on data showing that the COVID–19 virus can spread rapidly among

healthcare workers and from them to patients, and that such spread is more likely when

healthcare workers are unvaccinated." *Id.* (citing 86 Fed. Reg. at 61,558–61,561, 61,567–

61,568, 61,585–61,586). The Secretary "also explained that, because Medicare and Medicaid

patients are often elderly, disabled, or otherwise in poor health, transmission of COVID–19 to

such patients is particularly dangerous." *Id.*

The CMS Rule initially contemplated that all relevant staff would receive the first dose of

a two-dose COVID-19 vaccine or a single-dose COVID-19 vaccine or have been granted an

exemption under the facility's exemption policies, by December 6, 2021 ("Phase 1"). The Rule

also contemplated that by January 4, 2022, non-exempt staff who are covered by the Rule

would be fully vaccinated ("Phase 2"). In light of additional litigation, the Secretary later

exercised his enforcement discretion to modify the timeline for compliance for healthcare

---

health-care-vaccine-mandate-survives-supreme-court-appeal?leadSource=uverify%20wall. *See
Missouri v. Biden*, No. 21-1463, *cert. denied*, Oct. 3, 2022.

facilities in certain states, including Utah, resulting in a February 14, 2022, deadline for Phase 1, and a March 15, 2022, deadline for Phase 2.

On March 4, 2022, Dr. Griner filed the instant action, challenging the validity and the constitutionality of the CMS Rule. Dr. Griner is double board-certified in General Surgery and Plastic Surgery, and he is fellowship-trained in Pediatric Plastic and Craniofacial Surgery. He has admitting privileges at four Utah hospitals, all of which receive federal funding under the Medicare and Medicaid programs. He alleges that the CMS Rule unconstitutionally infringes on his fundamental right to refuse medical treatment. More specifically, he claims that the "Compulsory Injections," as he calls them, required by the CMS Rule are not "vaccines," as that term is traditionally understood, because they do not confer immunity to SARS-CoV-2 and do not prevent infection from or transmission of the virus. Instead, he claims, the injections were designed only to lessen the severity of symptomatic disease in the recipient, rendering them "medical treatments" that Dr. Griner claims he has a fundamental right to refuse.

Specifically, he asserts in his Complaint that the CMS Rule (1) violates his substantive due process right to "decisional privacy with regard to medical treatment" under the Fifth and Fourteenth Amendments to the Constitution; (2) deprives him of the equal protection of the laws under the Fifth and Fourteenth Amendments by treating vaccinated and unvaccinated health care practitioners differently, (3) and is *ultra vires* because the Defendants' actions in issuing the CMS Rule violate the Constitution of the United States in that they invade and encroach upon sovereign powers that reside solely in the States and have never been relinquished by the States to the Federal Government.

On April 1, 2022, Dr. Griner filed a Motion for a Preliminary Injunction based on the first count of his Complaint, alleging that COVID-19 vaccines are not effective in preventing transmission of the virus, that the injections are not actually vaccines but are medical treatments, and that the CMS Rule violates his fundamental right to refuse medical treatment under the substantive due process clause of the Fifth and Fourteenth Amendments.

Soon thereafter, Defendants filed a Motion to Dismiss. First, they argue, Dr. Griner lacks standing because he does not allege that any hospital has taken any action against him under any policies they have developed under the CMS Rule. For similar reasons, Defendants argue that Dr. Griner's claim is not ripe for judicial review. Because of these failings, Defendants assert that this court cannot exercise jurisdiction over Dr. Griner's action.

Moreover, Defendants argue, even if this court could exercise jurisdiction over Dr. Griner's action, his claims lack merit and should be dismissed for failure to state a claim. Specifically, they maintain that Dr. Griner's due process claim is without merit, given the century-old precedent of *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), which holds that there is no due process right to refuse vaccinations, even where (unlike here) the government imposes a vaccination requirement on the general population under threat of criminal sanctions. Defendants also contend that Dr. Griner's equal protection claim is meritless, as the distinction between vaccinated and unvaccinated healthcare practitioners does not create a suspect classification, and the Secretary certainly had a rational basis to conclude that vaccinations of healthcare staff would control the spread of a deadly virus.  Finally, Defendants argue that Dr. Griner's Tenth Amendment claim is likewise foreclosed by Supreme Court case

law upholding Congress's Spending Clause power to condition federal funds on terms that promote the general welfare. Accordingly, Defendants argue, Dr. Griner's Complaint should be dismissed for failure to state a claim.

## II. DEFENDANTS' MOTION TO DISMISS

Defendants move to dismiss this action for lack of standing, lack of ripeness, and failure to state a claim. Each of these arguments are addressed in turn.

### A. Standing & Ripeness

#### 1. Legal Standards

Standing is a prerequisite to a federal court's exercise of Article III jurisdiction, "serv[ing] to identify those disputes which are appropriately resolved through the judicial process." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations omitted). As explained by the Tenth Circuit Court of Appeals, Article III of the Constitution permits federal courts to decide only "Cases" or "Controversies." *Laufer v. Looper*, 22 F.3d 871, 876 (10th Cir. 2022) (citing U.S. Const. art. III, § 2). "To establish a case or controversy, a plaintiff must possess standing to sue." *Id*. (quotation omitted). For Article III standing, a plaintiff must plausibly allege (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) that is likely redressable by a favorable judicial ruling. *Rector v. City and Cty. of Denver*, 348 F.3d 935, 942 (10th Cir. 2003); *see also Spokeo, Inc. v.* Robins, 578 U.S. 330, 338 (2016); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). These requirements ensure that "the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Laufer,* 22 F.3d at 876 (internal quotations omitted).

Additionally, for this court to exercise Article III jurisdiction, a case must also be ripe for adjudication. *Peck v. McCann*, 43 F.4th 1116, 1133 (10th Cir. 2022). "Standing and ripeness are closely related in that each focuses on whether the harm asserted has matured sufficiently to warrant judicial intervention." *Id.* (internal quotations omitted). But unlike standing, ripeness issues focus "not on whether the plaintiff was in fact harmed, but rather whether the harm asserted has matured sufficiently to warrant judicial intervention." *Id.* (internal quotations omitted).

### 2. Standing Discussion

Defendants contend that Dr. Griner lacks standing to bring the instant action because he has alleged neither an actual injury nor a threatened injury that is "both real and immediate." *See City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02 (1983). To establish an actual injury, a plaintiff must show that he suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 338 (internal quotation marks omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.* at 565, n.2 (internal quotation omitted). Thus, the Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient. *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (internal quotations omitted).

In his Complaint, Dr. Griner alleges merely that "the hospitals in which he has the right to practice receive CMS funding. Thus, Dr. Griner must choose not just between his 'job and the jab,' . . . he must also choose between pursuing his passion for healing children with congenital defects and taking the Injection." Compl. ¶ 41. Although this allegation suggests that there is the *possibility* that the hospitals will suspend or revoke Dr. Griner's privileges, "[a]n Article III injury . . . must be more than a possibility." *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1282 (10th Cir. 2002). To demonstrate injury-in-fact, a plaintiff "must show that it 'has sustained or is *immediately in danger of sustaining some direct injury.*'" *Id.* (quoting *City of Los Angeles,* 461 U.S. at 101-02 (emphasis added)). Because Dr. Griner has not alleged that any hospital has suspended or revoked his practice privileges—or that any hospital has even discussed with him whether his privileges will continue if he does not obtain vaccination for COVID-19 or a qualifying exemption from vaccination—he has not shown an injury-in-fact.

In an attempt to survive Defendants' standing argument, Dr. Griner, in his Memorandum in Opposition to Defendants' Motion to Dismiss, provided a Supplemental Declaration to which he attached several newly submitted exhibits that purportedly demonstrate that he faces the "impending loss of [his] HCA clinical privileges." Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. to Dismiss at 5 [ECF No. 22]. There are, however, a multitude of problems with these submissions.

First, Defendants have mounted a facial challenge to the jurisdictional basis for the Complaint, which is resolved within the four corners of that pleading as of the date of the filing of the complaint. *Hill v. Vanderbilt Capital Advisors, LLC*, 702 F.3d 1220 (10th Cir. 2012); *Hansen*

*v. Harper Excavating, Inc.*, 641 F.3d 1216, 1224 (10th Cir. 2011). Dr. Griner's Complaint fails to allege that he "has sustained or is immediately in danger of sustaining some direct injury." *City of Los Angeles,* 461 U.S. at 101-02.

Even if Defendants had asserted a factual attack such that evidence outside the Complaint were properly considered here, the new evidence offered by Dr. Griner still fails to show that he has sustained or is immediately in danger of sustaining some direct injury. He has explained that two of the hospitals at which he has admitting privileges—Lone Peak Hospital and Timpanogos Hospital—are HCA hospitals. And, according to Dr. Griner, HCA has made it clear that the CMS Rule forced it to require all HCA staff and colleagues to receive the COVID-19 vaccination unless they qualify for or obtain a medical or religious exemption. Dr. Griner asserts that "HCA has notified me that my HCA clinical privileges will be revoked if I fail to comply with HCA's policy, which was instituted as a direct result of the CMS Mandate." Supp'l Griner Decl. ¶ 7, [ECF No. 22-2].[3]

---

[3] The court has not been able to locate any such language in the emails attached to Dr. Griner's Supplemental Affidavit, and several of the emails reminding HCA Staff about the vaccination requirement remain silent as to any consequences for failing to be vaccinated. The only email containing any mention of consequences for failing to be vaccinated is a November 2021 email stating that if employees fail to be vaccinated or receive an exemption, they "will no longer meet the ongoing obligations required for Medical Staff Membership and Clinical Privileges, and [they] will be subject to administrative action as provided in the Medical Staff governing documents." *See* Pl.'s Resp. Mem., Ex. F [ECF No. 22-7]. The court finds this vague statement to be insufficient, particularly in light of the fact that Dr. Griner's request for an exemption was denied well after the vaccination deadline, as discussed below, yet there is no suggestion that HCA took any action to revoke, even at that time.

Because Dr. Griner had previously recovered from COVID-19 and claims that he is "thus naturally immune to the disease," he submitted a request for medical exemption from HCA's Mandate on January 25, 2022. On April 25, 2022—well after Utah's February 14, 2022, Phase 1 vaccination deadline, HCA denied his requested medical exemption but invited him to resubmit it according to the instructions, which he had not followed.[4] Based on this email, Dr. Griner claims that he must now either receive the injection or lose his HCA privileges. But in his Supplemental Affidavit, signed on May 18, 2022 (almost a month after his exemption request was denied without prejudice to resubmitting it and three months after Utah's Phase 1 vaccination deadline), he still does not state that he has lost his admitting privileges or that he has been forced to cancel any surgeries. Instead, he uses the conditional tense regarding any possible loss of privileges:

> If my HCA clinical privileges are revoked, I would not be able to properly treat many of my current patients, including many of my pediatric patients, who depend on the amenities offered by the HCA facilities. HCA also has exclusive contracts with several insurance providers, and over half of my procedures are performed at the HCA facilities. Thus, should my HCA clinical privileges get revoked, many of my patients would no longer have coverage for my services.

---

[4] The email states that "the attachment [Dr. Griner] submitted as proof of [his] reason for declining COVID-19 vaccination has been reviewed and rejected" because it was signed by Dr. Griner himself and not by Dr. Griner's healthcare provider, as required by the form. S*ee* Supp'l Griner Decl., Ex. D. [ECF 22-5]. The form explicitly instructs that healthcare providers "cannot sign their own exemption/certification request." *Id*. Nevertheless, Dr. Griner listed himself as his healthcare provider and signed his own exemption request. The response email invites Dr. Griner to "fill in the HCA Healthcare Medical Exemption form and have it signed by [his] provider," and then he could resubmit it. *Id.* The email does not make any statement or threat about losing privileges even though Utah's Phase 1 vaccination deadline had passed over two months before the date of the email.

Pl.'s Resp. Mem., Ex. A.  [ECF 22-2]. In addition to the fact that Dr. Griner has failed to credibly

allege that any hospital "has sought to suspend or revoke [his privileges] or has threatened to

do so" or "any fact indicating that suspension or revocation may be imminent," *Essence, Inc.* v.

City of Federal Heights, 285 F.3d 1772, 1282 (10th Cir. 2002), Dr. Griner also has failed to

allege—in either his Complaint or his supplemental material submitted in opposition to

Defendants' motion— "any fact indicating . . . that [he] has altered [his] behavior as a result of

the [challenged] provision." *Id.* He has thus failed to "carr[y] [his] burden of demonstrating

standing." *Id.*

Moreover, even if a hospital were to take some action against him in the future, it

would only be a matter of speculation now as to whether that action would be taken as a result

of the CMS Rule or as a result of the hospital's own policies. Dr. Griner accordingly cannot meet

his Article III burden to show that any (at this point hypothetical) injury is traceable to the CMS

Rule.

Similarly, withholding judicial review at this time would not work any hardship on Dr.

Griner. He has not identified any scheduled or otherwise upcoming procedure that he wishes to

perform at one of the identified hospitals. He suffers no injury "unless and until" he seeks to

provide medical care at a hospital at which he has practice privileges and is prohibited from

doing so. *Texas v. United States*, 523 U.S. 296, 302 (1998).  Accordingly, Dr. Griner has failed to

meet his burden of alleging either an actual injury or a threatened injury that is "both real and

immediate," and thus, he lacks standing to bring this action.

12

### 3. Ripeness Discussion

Dr. Griner's failure to allege that any hospital has suspended or revoked his practice privileges—or even discussed with him whether his privileges will continue if he does not obtain vaccination for COVID-19—similarly renders his claims unripe. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300 (internal quotations omitted). "[W]here 'we have no idea whether or when . . . [a sanction] will be ordered,' the issue is not fit for adjudication." *Texas*, 523 U.S. at 300 (internal quotation omitted). Because Dr. Griner alleges no fact suggesting that any hospital has yet taken or threatened to take any action against him, his claims are unripe, and this court lacks jurisdiction.

## B.  Failure to State a Claim

### 1. Legal Standards

In considering a motion under Rule 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted. In making the dismissal determination, a court must accept all the well-pleaded allegations of the complaint as true, even if they are doubtful in fact, and must construe the allegations in the light most favorable to claimant. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *Alvarado v. KOB–TV, L.L.C.,* 493 F.3d 1210, 1215 (10th Cir.2007). A court, however, need not accept as true those allegations that are conclusory in nature. *Erikson v. Pawnee Cnty. Bd. Of Cnty. Com'rs,* 263 F.3d 1151, 1154–55 (10th Cir.2001). When legal conclusions are involved in the complaint, "the tenet that

a court must accept as true all of the allegations contained in a complaint is inapplicable to [those] conclusions," *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009). Thus, mere "labels and conclusions" will not suffice. *Twombly*, 550 U.S. at 555. Accordingly, in examining a complaint under Rule 12(b)(6), the court will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest that the defendant is liable.

### ii. Substantive Due Process

Dr. Griner alleges that COVID vaccines are not actually "vaccines," as that term has traditionally been understood, but are, "as a factual matter," medical treatments.[5]  Compl. ¶ 83 [ECF No. 2]. Based on his characterization of the vaccines as a "medical treatment", he argues that the CMS Rule violates his constitutional right to decisional privacy with regard to medical treatment. Compl. ¶ 86. More specifically, he claims that the Rule violates "the liberty

---

[5] Dr. Griner argues that "immunity is the *sine qua non* of all vaccines." Compl. ¶ 84 [ECF No. 2]. He then explains that the manufacturers admittedly did not design the "Injections" to confer immunity to SARS-CoV-2, let alone to prevent contraction or transmission thereof. Instead, he contends, the "Injections" were designed only as medical treatments for COVID-19. He claims that the CDC tacitly acknowledged this point when it quietly changed its definitions of "vaccine" and "vaccination" in September of 2021 by eliminating the word "immunity" from these definitions. Thus, according to Dr. Griner, these facts irrefutably demonstrate that the Injections are medical treatments, not "vaccines."

All recognized government agencies that have an expertise in this area characterize the COVID "injection" as a "vaccine," including the Centers for Disease Control, the Federal Drug Administration, the Secretary of Health and Human Services, and many others, who are undoubtedly aware of competing theories. As discussed below, it is not the court's role to second guess the medical and scientific experts, and the court need not accept Dr. Griner's unconventional characterization that the injections are actually medical treatments when it goes against the weight of scientific evidence. *See Jacobson v. Massachusetts*, 197 U.S. 11 (1905).

protected by the Fifth and Fourteenth Amendments to the Constitution, which includes rights

of personal autonomy, self-determination, bodily integrity and the right to reject medical

treatment," Compl. ¶ 82, and that the United States Supreme Court has recognized a "general

liberty interest in refusing medical treatment." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261,

278 (1990). He claims that the ability to decide whether to accept or refuse medical treatment

is a fundamental right subject to strict scrutiny.

Because Plaintiff challenges a generally applicable regulation that the Secretary issued

pursuant to a Congressional grant of authority, a "two-part substantive due process framework

is applicable." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009); *see also ETP*

*Rio Rancho Park, LLC v. Grisham*, 522 F. Supp. 3d 966, 1029 (D.N.M. 2021). First, the court must

"carefully describe the asserted fundamental liberty interest." *Dias*, 567 F.3d at 1181; *see also*

*Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). Second, the court must then determine

whether the asserted right—thus narrowly defined—is "deeply rooted in this Nation's history

and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor

justice would exist if they were sacrificed." *Dias*, 567 F.3d at 1181. If the challenged

government action infringes upon a fundamental right, it receives heightened judicial scrutiny;

if not, it receives rational basis review. *Id.*; *see also Valdez v. Grisham*, 559 F. Supp. 3d 1161,

1172-73 (D.N.M. Sept. 13, 2021), *affirmed*, No. 21-2105, 2022 WL 2129071 (10th Cir. June 14,

2022).

Here, Dr. Griner fails to narrowly define the right at issue, and when the proper claim is

defined, no fundamental right is implicated. Dr. Griner asserts a constitutional right to remain

unvaccinated while working at federally funded healthcare facilities. The CMS Rule conditions Medicare and Medicaid funding for healthcare facilities on the facilities' agreement to develop policies to ensure that their staff either receive COVID-19 vaccination or obtain an exemption. *See* 86 Fed. Reg. at 61,561. Thus, to the extent that the Rule implicates any liberty interest, it is Dr. Griner's interest in remaining unvaccinated from a deadly and highly transmissible disease while treating patients at federally funded hospitals.

Under case law that has been in place for more than a hundred years, however, there is no fundamental right to refuse vaccination, even where (unlike here) the government would impose a vaccination requirement on the general population under threat of criminal sanctions. *See Jacobson v. Massachusetts*, 197 U.S. 11 (1905). Dr. Griner attempts to avoid *Jacobson* by asserting that the Vaccination Rule instead infringes on his "fundamental human right to refuse medical treatments." Pl.'s Mot. 10-13, 15, 18-19 (citing *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990)). But, in *Cruzan* itself, the Supreme Court cited *Jacobson* for the proposition that any such liberty interest is outweighed by the government's interest in preventing disease by requiring or encouraging vaccinations. *Cruzan*, 497 U.S. at 278; *see also We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 293 (2d Cir. 2021).

Dr. Griner nonetheless insists that the COVID-19 vaccines should be considered to be "medical treatments" rather than "vaccinations" because, in his view, the vaccines are ineffective in preventing the transmission of SARS-CoV-2. The central point of *Jacobson*, however, was that the courts lack the institutional capacity to second-guess policymakers in their decision making as to whether vaccines are effective in preventing disease.

16

The defendant in the *Jacobson* criminal prosecution had argued that some doctors did not believe that vaccination would prevent the spread of smallpox. *Jacobson*, 197 U.S. at 30. The Court rejected this claim, explaining that it presumed that policymakers were aware of the competing views of medical experts, and that it was the role of policymakers, not the courts, to evaluate opposing theories as to how best to "meet and suppress the evils of a smallpox epidemic that imperiled an entire population." *Id*. at 30-31. The Court acknowledged the "possibility that the belief [that vaccines were effective] may be wrong, and that science may yet show it to be wrong," but held that this was "not conclusive; for the legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases." *Id*. at 35; *see also Valdez*, 559 F. Supp. 3d at 1175.

Dr. Griner, therefore, may not avoid the holding of *Jacobson* by asserting his disagreement with the Secretary's understanding of the evidence. But, in any event, the Secretary had ample grounds—and certainly, a rational basis—to conclude that the available vaccines are effective in controlling the spread of SARS-CoV-2. Dr. Griner may have a different view of the scientific evidence, but "[i]t is no part of the function of a court" to weigh such evidence. *Jacobson*, 197 U.S. at 30. Rather, the evaluation of the relative efficacy of vaccines is "a determination for the [policymaker], not the individual objectors." *Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015) (citing *Jacobson*, 197 U.S. at 37-38); *see also Doe v. Zucker*, 520 F. Supp. 3d 217, 251 (N.D.N.Y. 2021); *Valdez*, 559 F. Supp. 3d at 1177.

In addition, it does not help Dr. Griner to assert that he cannot "refuse" COVID-19 vaccines. The Rule does not *force* anyone to receive vaccines; personnel who work in federally

funded healthcare settings may choose to receive the vaccine, they may seek an exemption based on a medical condition or religious objection, or they may choose to pursue other employment. *See We The Patriots USA*, 17 F.4th at 293–94 ("Vaccination is a condition of employment in the healthcare field; the State is not forcibly vaccinating healthcare workers."); *Valdez*, 559 F. Supp. 3d at 1176-77  (The New Mexico Public Health Emergency Order does not directly infringe on the protected right to refuse medical treatment. . . . Rather, it conditions plaintiff's right to be employed at a covered entity on her vaccination against COVID-19); *Norris v. Stanley*, 567 F. Supp. 3d 818, 821 (W.D. Mich. 2021) ("The MSU vaccination policy does not force Plaintiff to forego her rights to privacy and bodily autonomy, but if she chooses not to be vaccinated, she does not have the right to work at MSU at the same time."); *Bauer*, 568 F. Supp. 3d at 592 ("[A] more appropriate description [of the rights at issue] is plaintiff's interest in continued employment with defendants while unvaccinated for COVID-19."); *Brnovich v. Biden*, 562 F. Supp. 3d 123, 163 (D. Ariz. 2022) ("Properly construed, this case raises only the much narrower question whether there is a substantive due process right to refuse vaccination while an employee of a federal contractor" – a "question easily answered in the negative."); *Beckerich v. St. Elizabeth Med. Ctr.*, 563 F. Supp. 3d 633, 644 (E.D. Ky. 2021) ("Plaintiffs are choosing whether to comply with a condition of employment, or to deal with the potential consequences of that choice.").

The CMS Rule does not force Dr. Griner to consent to vaccination. Unlike the plaintiffs in *Cruzan* and its progeny, Dr. Griner is not "being forcibly injected or forcibly given unwanted medical treatment," or otherwise "facing vaccination against [his] will." *Bauer v. Summey*, 568

F. Supp. 3d 573, 592 n.5 (D.S.C. 2021). To the contrary, he remains free to choose whether to be vaccinated. Accordingly, the CMS Rule does not "directly infringe[ ]" on the protected right to refuse medical treatment, and the *Cruzan* line of cases is inapposite. See *Andre-Rodney*, 569 F. Supp. 3d at 139. Because the CMS Rule is not a requirement imposed on the general public, but instead is a condition on federal funding for healthcare facilities, "this case is easier than *Jacobson*." *Klaassen v. Trs. of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021).

In sum, in "carefully describ[ing]" the liberty interest that is at issue here, *Dias*, 567 F.3d at 1181, this case involves an interest in avoiding vaccination while treating patients at a hospital, not a general right to refuse medical treatment. *See Valdez*, 559 F. Supp. 3d at 1173 (holding that plaintiffs' "assertion of broadly defined rights falls short of providing the 'careful description'" required and finding no fundamental right "to work in a hospital . . . unvaccinated and during a pandemic").

The next step is to determine whether the claimed right is "fundamental" in the American legal tradition. Dr. Griner enjoys no fundamental right to remain unvaccinated while practicing medicine at federally funded healthcare facilities. A right to refuse vaccination is not "deeply rooted in this Nation's history and tradition." *Dias*, 567 F.3d at 1181 (quoting *Glucksberg*, 521 U.S. at 720-21). To the contrary, "vaccination requirements, like other public-health measures, have been common in this nation." *Klaassen*, 7 F.4th at 593; *see also Biden v. Missouri*, 142 S. Ct. 647, 653 (2022). The Rule thus does not burden any "fundamental right ingrained in the American legal tradition." *Klaassen*, 7 F.4th at 593; *accord, e.g., Doe v. Zucker*, 520 F. Supp. 3d 217, 249–53 (S.D.N.Y. 2021).

For this reason, the federal courts have consistently held that vaccine mandates do not implicate a fundamental right. *See Klaassen*, 7 F.4th at 593; *We The Patriots USA*, 17 F.4th at 293–94; *Norris v. Stanley*, No. 1:21-CV-756, 2021 WL 4738827, at *2 (W.D. Mich. Oct. 8, 2021) (unpublished). Nor does the CMS Rule implicate any fundamental right of Dr. Griner's to work as a surgeon. As the Tenth Circuit has explained, the asserted "right to practice in [one's] chosen profession . . . does not invoke heightened scrutiny." *Valdez*, 559 F. Supp. 3d at 1173 (quoting *Guttman v. Khalsa*, 669 F.3d 1101, 1118 (10th Cir. 2012)).

Accordingly, there is no fundamental right to refuse vaccinations necessary to prevent the spread of communicable diseases. That principle has even more force in the context of the Secretary's narrowly targeted rule, which does not impose a vaccination requirement on the general public, but instead conditions federal funding for healthcare facilities on their development and implementation of policies to ensure that their non-exempt staff are vaccinated.

In addition, the Rule has a rational basis. Where a substantive due process claim does not implicate a fundamental right, the challenged government action need only survive rational basis review. *Valdez*, 559 F. Supp. 3d at 1173; *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring) (explaining that *Jacobson* "essentially applied rational basis review" to a vaccination requirement). "[R]ational basis review is highly deferential toward the government's actions. The burden is on the plaintiff to show the governmental act complained of does not further a legitimate state purpose by rational means." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 772 (10th Cir. 2008). The challenged measure

"is presumed constitutional," and "[t]he burden is on the one attacking [it] to negative every conceivable basis which might support it." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993).

The Supreme Court has held that the CMS Rule was "not arbitrary and capricious," and that the Secretary reasonably explained his decisions to (1) "impose the vaccine mandate instead of a testing mandate," (2) "require vaccination of employees with 'natural immunity' from prior COVID-19 illnesses;" and (3) "depart from the agency's prior approach of merely encouraging vaccination." *Biden v. Missouri*, 142 S. Ct. at 653-54. Because the Supreme Court held that the Rule is not arbitrary and capricious, it necessarily follows that the Rule is rational for purposes of due process review. *See Ursack Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 958 (9th Cir. 2011) (holding that "rational basis scrutiny" is "identical to arbitrary and capricious review under the APA"). The Secretary had a rational basis to conclude that COVID-19 poses a serious threat to the health and safety of patients at Medicare- and Medicaid-funded facilities, and that the vaccination of healthcare staff would help to protect those patients. S*ee Valdez*, 559 F. Supp. 3d at 1176.

Dr. Griner contends that the CMS Rule is not narrowly tailored because it does not exempt persons who were previously infected with SARS-CoV-2. The Supreme Court has already rejected this argument, finding that the Secretary had reasonably explained his decision not to provide for such an exemption. *Biden v. Missouri*, 142 S. Ct. at 653. In any event, "rational-basis review does not give courts the option to speculate as to whether some other scheme could have better regulated the evils in question." *Powers v. Harris*, 379 F.3d 1208, 1217 (10th Cir. 2004). Put another way, rational basis review contains no tailoring requirement.

*Reno v. Flores*, 507 U.S. 292, 305 (1993) ("[N]arrow tailoring is required only when fundamental

rights are involved.").

Therefore, courts have uniformly rejected claims that vaccination requirements subject

plaintiffs to unconstitutional conditions. *See, e.g., Doe v. Zucker*, 520 F. Supp. 3d at 268; *Norris*

*v. Stanley*, 2021 WL 4738827, at *3 (unpublished); *Smith v. Biden*, No. 1:21-CV-19457, 2021 WL

5195688, at *8 (D.N.J. Nov. 8, 2021) (unpublished). Dr. Griner has failed to state a substantive

due process claim, and the claim is therefore dismissed.

### 2. Equal Protection

Dr. Griner raises a claim under the Fifth Amendment's equal protection clause, asserting

that the vaccination rule improperly discriminates against the "class" of unvaccinated

healthcare workers and favors vaccinated workers. "'[U]nless a legislative classification either

burdens a fundamental right or targets a suspect class, it need only bear a rational relation to

some legitimate end to comport with' equal protection." *Curley v. Perry*, 246 F.3d 1278, 1285

(10th Cir. 2001). As explained above, the vaccination rule infringes on no fundamental right,

and a rule that distinguishes between vaccinated and unvaccinated healthcare professionals

does not draw lines on the basis of a suspect or quasi-suspect class. *See Save Palisade*

*FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002) (listing suspect and quasi-suspect

classes).

Dr. Griner's equal protection claim is therefore subject only to rational basis review. *See*

*Valdez*, 559 F. Supp. 3d at 1174. And, for the same reasons that the CMS Rule is rational for

purposes of substantive due process, it is also rational in the context of equal protection. *See*

*Powers v. Harris*, 379 F.3d at 1215 (rational basis review under due process and under equal protection "proceeds along the same lines"). It is reasonable for the Secretary to distinguish between the vaccinated and unvaccinated because the latter are significantly more likely to contract, spread, be hospitalized for, and die of COVID-19. For this reason, courts have uniformly rejected equal protection claims challenging COVID-19 vaccination requirements. *See, e.g., Does 1-6 v. Mills*, 16 F.4th 20, 35 (1st Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022); *Kheriaty v. Regents of Univ. of Cal.*, No. SACV-21-01367-JVS (KESx), 2021 WL 4714664, at *7 (C.D. Cal. Sept. 29, 2021) (unpublished); *Valdez*, 559 F. Supp. 3d at 1178.

The CMS Rule "need only bear a rational relation to some legitimate end to comport with" the Fifth Amendment's equal protection component. *Curley v. Perry*, 246 F.3d 1278, 1285 (10th Cir. 2001). As explained above, the rule easily survives this deferential standard of review. *See, e.g., Does 1-6 v. Mills*, 16 F.4th 20, 35 (1st Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022).

**3. Ultra Vires**

In Count III of his Complaint, Dr. Griner asserts that the Secretary lacked the authority to issue the Rule and that the Rule is *ultra vires*. [6] Compl., ¶¶ 110-114 [ECF No. 2]. This claim, however, is foreclosed by the Supreme Court's recent decision in *Biden v. Missouri*, 142 S. Ct. 647 (2022), which upheld the Rule. The Supreme Court held that "the Secretary's rule falls within the authorities that Congress has conferred upon him." *Id*. at 652. The Secretary has the

---

[6] In his preliminary injunction motion, Plaintiff disclaims any challenge to "the rule-making authority of CMS or the Secretary of Health and Human Services." Pl.'s Mot. at 4 [ECF No. 17]. *See* Pls. Compl. at 111-13 [ECF No. 2]; *see also* Pls. Reply in Supp. at 8 [ECF No. 21]. The court addresses the argument in case any question remains.

"general statutory authority to promulgate regulations 'as may be necessary to the efficient administration of the functions with which [he] is charged.'" *Id*. at 650 (quoting 42 U.S.C. § 1302(a)). "One such function—perhaps the most basic, given the Department's core mission—is to ensure that the healthcare providers who care for Medicare and Medicaid patients protect their patients' health and safety." *Id*. "To that end, Congress authorized the Secretary to promulgate, as a condition of a facility's participation in the programs, such 'requirements as [he] finds necessary in the interest of the health and safety of individuals who are furnished services in the institution.'" *Id*. (quoting 42 U.S.C. § 1395x(e)(9)). The Court noted that, "[r]elying on these authorities, the Secretary has established long lists of detailed conditions with which facilities must comply to be eligible to receive Medicare and Medicaid funds." *Id*. "Such conditions have long included a requirement that certain providers maintain and enforce an 'infection prevention and control program designed . . . to help prevent the development and transmission of communicable diseases and infections.'" *Id*. at 650-51 (quoting 42 C.F.R. § 483.80).

The CMS Rule thus "is a straightforward and predictable example of the 'health and safety' regulations that Congress has authorized the Secretary to impose." *Id*. at 653. "Vaccination requirements are a common feature of the provision of healthcare in America: Healthcare workers around the country are ordinarily required to be vaccinated for diseases such as hepatitis B, influenza, and measles, mumps, and rubella." *Id.*

The Court also held that it "disagree[d] with respondents' remaining contentions in support of the injunctions entered below." *Id*. at 653. These remaining contentions included a

claim by the State of Utah and other States that the vaccination rule violated the Tenth

Amendment by intruding on their police power over public health matters. *See* Response to

Application for a Stay Pending Appeal at 1, 23-27, *Becerra v. Louisiana*, Nos. 21A240, 21A241

(U.S. Dec. 30, 2021). The respondents argued that, at a minimum, the Supreme Court should

interpret the statute to avoid the asserted constitutional problems. *See id*. at 27. The Supreme

Court nonetheless ruled in the Secretary's favor and interpreted the statute to authorize the

Rule, effectively disposing of the Tenth Amendment claim as well.

It is unsurprising that the Supreme Court disposed of the constitutional claim so easily.

Congress has exercised its authority under the Spending Clause by instructing the Secretary to

ensure that federally funded healthcare facilities protect the health and safety of their patients.

"Congress has authority under the Spending Clause to appropriate federal moneys to promote

the general welfare" and "to see to it that taxpayer dollars appropriated under that power are

in fact spent for the general welfare[.]" *Sabri v. United States*, 541 U.S. 600, 605 (2004). When

Congress acts pursuant to its Spending Clause power, it may do so in ways that serve objectives

traditionally thought of as within the police power of the States. *See South Dakota v. Dole*, 483

U.S. 203, 207 (1987) (upholding a state minimum drinking age as a condition on the acceptance

of federal funds). Congress's power to impose conditions on federal funds applies even if

Congress legislates "in an area historically of state concern." *Id*. at 608. Thus, for as long as

these programs have been in existence, "healthcare facilities that wish to participate in

Medicare and Medicaid have always been obligated to satisfy a host of conditions that address

the safe and effective provision of healthcare[.]" *Biden v. Missouri*, 142 S. Ct. at 652.

Dr. Griner appears to have recast his claim as one challenging an "unconstitutional condition," but that claim also fails. "[T]he unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013). In order to state a claim under this doctrine, Dr. Griner must identify a constitutional right that he is being coerced into giving up. *Petrella v. Brownback*, 787 F.3d 1242, 1265 (10th Cir. 2015) ("The doctrine only applies if the government places a condition on the exercise of a constitutionally protected right."). But as explained above, Dr. Griner cannot point to any such right, and his Tenth Amendment claim thus fails as a matter of law.

## III. CONCLUSION

For the foregoing reasons, the court grants Defendants' Motion to Dismiss [ECF No. 19] and therefore DISMISSES Dr. Griner's Complaint with prejudice. Because the Complaint is dismissed with prejudice, Dr. Griner's Motion for a Preliminary Injunction [ECF No. 17] is necessarily DENIED AS MOOT.

DATED this 13th day of October, 2022.

BY THE COURT:

DALE A. KIMBALL
United States District Judge